**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Ruth A. Tremblay,

Plaintiff,

v.

Liberty Enterprises, Inc.,

Defendant.

Civil No. 00-1983 (DWF/AJB)

**MEMORANDUM OPINION AND ORDER**

---

Jerome A. Burg, Esq., Burg Law Office, 250 Third Avenue North, Suite 650, Minneapolis, MN 55401, appeared on behalf of Plaintiff.

James F. Hanneman, Esq., Maslon Edelman Borman & Brand, 3300 Norwest Center, 90 South Seventh Street, Minneapolis, MN 55402-4140, appeared on behalf of Defendant.

---

**Introduction**

The above-entitled matter came on for hearing before the undersigned United States District Judge on November 2, 2001, pursuant to Defendant's motion for summary judgment. In the Complaint, Plaintiff alleges discrimination and retaliation in violation of the Americans with Disabilities Act, the Minnesota Human Rights Act, and the Family and Medical Leave Act. For the reasons set forth below, Defendant's motion is granted.

NOV 0 9 2001
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD NOV 0 9 2001
DEPUTY CLERK

## Background[1]

Plaintiff Ruth Tremblay ("Tremblay") worked for Defendant Liberty Enterprises ("Liberty") as a marketing graphics manager. As of July of 1999, Tremblay supervised roughly a dozen employees and reported, herself, to Brian Burke ("Burke").

On July 19, 1999, Tremblay and Burke had a meeting. During that meeting, Tremblay's right hand developed a noticeable tremor. Burke inquired about the tremor, asking Tremblay if she was alright. Tremblay replied that the tremor was the result of a head injury she had sustained in an accident many years before. Later that day, Tremblay indicated she was not feeling well and went home.

Burke alleges that he was concerned for Tremblay. She had failed to turn in a number of weekly reports, and another employee had expressed concern over her availability. Coupled with Burke's own perception that Tremblay had not been "herself" and the tremor, Burke was worried about Tremblay's health. Burke contacted Heather Siverhus ("Siverhus") in Liberty's human resources department.

Siverhus and Burke met with Tremblay on July 23, 1999. During that meeting, Siverhus explained that Tremblay might be eligible for leave under the Family and Medical Leave Act ("FMLA"). Siverhus gave Tremblay a letter from Dan Boomhower ("Boomhower"), Liberty's Director of Human Resources, and a FMLA Certification of Health Care Provider form for Tremblay's physician to fill out.

---

1 The Court articulates the facts in the light most favorable to the Plaintiff. The parties paint very different pictures of the circumstances and events which form the basis of this litigation; while the Court does not qualify its statements throughout the recitation of the facts, the Court is mindful that this represents only one perspective on the situation.

Tremblay asserts that, after the meeting, she examined the letter from Boomhower more closely and grew concerned that she was being compelled to apply for FMLA leave. On its face, the letter indicates that Tremblay's "health condition may qualify [her] for the Federal Family Medical Leave Act." It goes on to request that Tremblay have her physician fill out the form within two weeks.

On July 28, 1999, Tremblay spoke with Siverhus about the FMLA certification form. Tremblay indicated that she did not wish to take any leave because she was not sick; expressed concern that she was apparently forced to fill out the form and that doing so would disclose confidential medical information; and admitted confusion over the status of her paid leave. Tremblay alleges that Siverhus told her, on the one hand, that the FMLA leave status would protect Tremblay's position with Liberty but, on the other hand, that Tremblay would be fired if she did not have her physician complete the form.[2] Eventually, Siverhus directed Tremblay to take her concerns and questions to Boomhower.

Angered and frustrated by this discussion, Tremblay had another Liberty employee (someone she supervised) assist her in cleaning out her cubicle and taking all of her belongings

---

[2] It is worth noting that Siverhus denies making any such statement. Siverhus has testified that she was attempting to explain the benefits of FMLA to Tremblay and that she told Tremblay that, absent FMLA leave status, Tremblay could be terminated for excessive absenteeism if her condition caused her to miss a lot of work. Indeed, Tremblay's deposition testimony conflicts with her own contemporaneous account of the conversation, memorialized in an August 9, 1999, memorandum to Burke. In that memorandum, Tremblay indicates that Siverhus told her that, if she refused FMLA benefits, she might be subject to disciplinary action and termination *when her personal days were exhausted*, not simply subject to disciplinary action or termination for refusing FMLA leave. Regardless, the Court must, at this point, view the evidence in the light most favorable to Tremblay.

Ultimately, Tremblay did not turn in a FMLA certification form until at least August 18 (after she actually began taking leave at her doctor's request), well over two weeks after the date of the Boomhower letter, but Tremblay was not fired.

to her car. She left a voice-mail message for Burke (who was away at a conference) indicating that she would be taking the next two days (Thursday and Friday) off from work while she considered whether she could continue to work for Liberty.

On August 3, 1999, Burke and his supervisor, Merickel, met with Tremblay to discuss her recent performance. According to Tremblay, all parties used profanity during the meeting, and Burke and Merickel berated Tremblay for not filling out the FMLA certification form.

After the meeting, Burke decided to draft a written corrective action notice. Burke noted that Tremblay had taken two days off without permission; that she had used profanity in the August 3 meeting; that she had discussed personal information with her subordinates and enlisted their support in moving her belongings from her cubicle; that she had failed to submit a number of reports on time; and that she had some leadership problems. After Tremblay reviewed the notice, Burke agreed to remove the reference to profanity.

Tremblay responded to the complaints in the corrective action notice through a memorandum dated August 9, 1999.

On August 16, 1999, Tremblay's physician, Dr. Ware, sent a memorandum to Liberty indicating that Tremblay could not continue to work. Dr. Ware informed Liberty that Tremblay was suffering from anxiety as a result of the controversy at work. The FMLA certification subsequently submitted to Liberty indicated that Tremblay was suffering from depression and anxiety.

On Saturday, August 21, 1999, Paul Annett, Liberty's Executive Vice President of Administration, met with Tremblay and her partner at a local restaurant; the meeting was arranged at Annett's request. The events of the meeting and the reasons for it are in dispute. Tremblay alleges, however, that Annett expressed his belief that Tremblay could not work with

Burke in the future because their relationship had deteriorated during the FMLA controversy. Tremblay further alleges that Annett brought up the possibility of a severance package. Tremblay's partner ended the meeting at that point.

After receiving the FMLA certification form, Liberty placed Tremblay on FMLA leave effective August 16 (the first day of her extended absence). Given that FMLA leave is 12 weeks long, Tremblay's leave was set to expire on November 8, 1999. Liberty continued to pay Tremblay until September 30, 1999.[3] Moreover, on October 14, 1999, Dr. Ware requested that Tremblay's leave be extended beyond November 8, 1999, to December 14, 1999. Liberty agreed to this extension and held her job open for her until that date.

Tremblay asserts that the following additional incidents took place while she was on leave. First, Burke instructed another employee, one of Tremblay's friends, that she could remove Tremblay's personal items from her cubicle and deliver them to Tremblay. Second, in an attempt to get Liberty employees to focus on their work, Burke drew a circle, intended to represent the work group, on a chalkboard; drew a mark outside of the circle intended to represent Tremblay; and informed the group that their focus needed to be on the circle, what was happening at work, rather than on Tremblay (although he noted that the workers were free to visit Tremblay on their own time). Third, Liberty investigated the possibility that Tremblay had been devoting excessive work time to personal activities, specifically operating her own internet

---

[3] It appears that Tremblay may have requested short term disability benefits for the duration of her FMLA leave, but she was informed that, because both she and her doctor indicated that work stress caused her condition, the situation was governed by worker's compensation rather than short term disability. It is not clear whether or not Tremblay received worker's compensation benefits after September 30.

business; Liberty removed Tremblay's computer from her cubicle as a part of this investigation. The investigation was never resolved.

On December 13, 1999, the day before she was scheduled to return to work, Tremblay submitted her letter of resignation. In the letter, Tremblay admitted that Liberty had honored all of her leave requests, but expressed her belief that Liberty had failed to remedy the perceived discrimination of July and August. Tremblay concluded: "I am left with no other alternative but to do what you have already effectively done for me–terminate my employment with Liberty effective immediately."

**Discussion**

**1. Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Fed. R. Civ. P. 1. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party

opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

**2. Adverse Employment Action**

Tremblay had brought claims of disability discrimination in violation of the ADA and the MHRA as well as claims of reprisal and retaliation in violation of the ADA, the MHRA, and the FMLA. Liberty challenges all of these claims on a variety of fronts. Liberty alleges: (1) that Tremblay was neither disabled nor perceived as disabled within the meaning of the ADA and the MHRA; (2) that Tremblay did not engage in protected conduct because she did not challenge any act or practice forbidden by the ADA, the MHRA, or the FMLA; (3) that Tremblay has failed to allege that Liberty took any actionable adverse employment action against Tremblay; and (4) that Tremblay has failed to offer evidence that Liberty's legitimate non-discriminatory reasons for its actions are merely pretextual.

Each of Tremblay's claims requires, as part of Tremblay's *prima facie* case, that Tremblay prove that she was subjected to an adverse employment action. Because Tremblay has not met that burden, Liberty is entitled to summary judgment on each of Tremblay's claims, and the Court need not address the other bases for Liberty's summary judgment motion.

To qualify as an "adverse employment action," an employer's action must have a materially adverse impact on the employee's terms and conditions of employment. *See Ledergerber v. Stangler,* 122 F.3d 1142, 1144 (8th Cir.1997). Tremblay has not alleged any action at all which had a materially adverse impact on the terms and conditions of her employment. She alleges that Liberty threatened to terminate her if she failed to submit the FMLA forms, but she did not submit those forms and Liberty did not terminate her. Liberty

drafted one written reprimand, but that reprimand had no effect on Tremblay's benefits, duties, or compensation. Liberty offered her a severance package, but they did not force her to take it and they did not terminate her.

Instead of relying on a single "adverse employment action," Tremblay asserts that she was constructively discharged from Liberty. The bases for this assertion are: (1) Siverhus was rude to her on the phone; (2) Burke and Merickel were abusive during a single meeting; (3) Burke drafted a single written corrective action notice; (4) Annett offered her a severance package and indicated that it would be difficult for Tremblay and Burke to continue working together; (5) Burke's chalk drawing[4]; (6) Burke's decision to send Tremblay's personal belongings home to her; and (7) Liberty's investigation of Tremblay's internet business.

"A constructive discharge occurs when an employer renders the employee's working conditions intolerable, forcing the employee to quit. . . . The conduct complained of must have been 'severe or pervasive enough to create and objectively hostile or abusive work environment . . . .'" *Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.*, 130 F.3d 349, 354 (8th Cir. 1997) (citations omitted). Here, no reasonable jury could conclude that the incidents described by Tremblay were severe and pervasive enough to compel a reasonable person to quit. This is true if you look at the complained-of incidents in a vacuum, but it is particularly true when you consider them in the context of the uncontroverted facts that Burke complimented

---

[4] This particular incident cannot possibly be the basis for a constructive discharge claim because Tremblay was on leave at the time it took place; unless Burke had reason to believe that the incident would be reported back to Tremblay–and there is nothing in the record to support such an inference–then Burke could not have taken this action with the intent of driving Tremblay to quit. The incident, at best, offers evidence that Liberty hoped Tremblay would quit (although, based on the only non-hearsay description of the event, it does not even really demonstrate bad motive).

Tremblay on her performance *after* he reprimanded her; that Liberty held Tremblay's position open for longer than they were required to by law, and that Liberty paid Tremblay for a portion of her leave even though they were not required to do so. *See Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241, 1247 (8th Cir. 1998) (court finding that plaintiff received positive reviews *after* the allegedly discriminatory negative reviews was significant in analysis of constructive discharge claim).

Moreover, "[t]o act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly. An employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996) (citations omitted). Tremblay's "problem" with her work environment was three-fold: (1) she was unhappy that Liberty seemed to be forcing her to take FMLA leave; (2) she was unhappy that Burke criticized her performance; and (3) she was unhappy that Annett offered her a severance package. The FMLA issue was, for all intents and purposes, resolved when Tremblay did not fill out the forms for leave for her tremor and was not fired as she feared she would be. In the August 9 memorandum, Tremblay expressed her belief that Burke's criticism was unfounded, but she did not request or suggest any remedial action, and she had signed the reprimand form. Tremblay never complained to anyone about Annett's offer.

Ultimately, then, three months after any even potentially negative interaction with Liberty, Tremblay quit. Upon the facts in this record, Liberty had no reason to believe that there were any outstanding issues to be resolved; they certainly had no opportunity to resolve them.

In short, the Court concludes that no reasonable jury could conclude that Liberty subjected Tremblay to any form of adverse employment action, including constructive discharge. In the absence of an adverse employment action, all of Tremblay's claims fail as a matter of law.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. Defendant's Motion for Summary Judgment (Doc. No. 7) is **GRANTED**.

2. Plaintiff's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: November 9, 2001

DONOVAN W. FRANK
Judge of United States District Court

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*